UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF NEW YORK

------------------------------------------X

ANTHONY GUARDINO,

                Petitioner,          11 Civ. 6906

   -against-                        OPINION

JOHN SABOURIN, Superintendent, Bare
Hill Correctional Facility,

                Respondent.

------------------------------------------X

A P P E A R A N C E S:

        Attorneys for Petitioner

        PELUSO & TOUGHER
        70 Lafayette Street
        New York, NY  10013
        By:  David Touger, Esq.

        Attorneys for Respondent

        N.Y.S. Office of the Attorney General
        120 Broadway
        New York, NY  10271
        By:  Lisa E. Fleischmann, Esq.

USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:
DATE FILED: 12/3/12

**Sweet, D.J.**

Anthony Guardino ("Guardino" or the "Petitioner") filed a petition seeking habeas corpus relief pursuant to 28 U.S.C. § 2254 to vacate his conviction entered on February 6, 2007, in New York State Supreme Court, New York County (the "Trial Court"), convicting him, after a jury trial, of Enterprise Corruption (N.Y. Penal Law § 460.20(1)(a)), Combination in Restraint of Trade and Competition (General Business Law §§ 340, 341), 13 counts of Bribe Receiving by a Labor Official (N.Y. Penal Law § 180.25) and seven counts of Grand Larceny in the Third Degree by Extortion (N.Y. Penal Law § 155.35). The Trial Court sentenced the Petitioner to an aggregate prison term of 6 to 18 years.

In the alternative, the Petitioner requests that this Court order a reconstruction hearing to enable the prosecution (the "Prosecution" or the "People") to provide neutral reasons for its peremptory changes.

Based upon the conclusions set forth below, the petition is denied.

1

I. **Prior Proceedings**

On July 15, 2004, a New York County grand jury returned a 54-count indictment against the Petitioner, John Barbato ("Barbato"), Michael Verdi ("Verdi"), Sebatino Russo ("Russo"), John Esposito ("Esposito"), Donna Catalano ("Catalano"), Michael Errante ("Errante"), Joseph Garito ("Garito"), and Local Union No. 8 of the United Union of Roofers, Waterproofers and Allied Workers (the "Local") (collectively the "Defendants").  Indictment No. 3491/04.  The indictment charged the Defendants with enterprise corruption and combination in restraint of trade, as well as related crimes that included multiple counts of grand larceny by extortion and bribe-receiving by a labor official.  Prior to trial, Russo, Barbato, Verdi, and the Local entered guilty pleas and Catalano entered a plea and cooperation agreement, pursuant to which she testified at trial.

On October 16, 2006, the Petitioner, Garito, Errante, and Esposito proceeded to trial before the Honorable Robert H. Straus and a jury in the Trial Court.  Errante and Garrito were acquitted on all counts.  Esposito was acquitted of some counts but convicted of bribe-receiving.  The Petitioner was acquitted

of some counts but convicted of enterprise corruption and other counts.

## A) The Voir Dire Proceedings

On October 23, 2006, several panels of prospective jurors were asked to complete questionnaires, and then examined in connection with challenges for cause (Voir Dire Volume 1: 10/16/06 to 10/23/06).  The Prosecution and defense were given time to review the questionnaires and to make motions to the Trial Court to dismiss those jurors that they felt would be unable to be fair and impartial (A. at 1-79).

From the remaining venire, 26 remaining jurors were chosen to be orally questioned (Id. at 97-99).  The parties questioned the prospective jurors and the Trial Court excluded one prospective juror for cause.  (Id. at 202-03).  The Trial Court described the challenging procedure and Garrito's counsel, David Touger, Esq. ("Touger"), was elected to exercise peremptory challenges for all of the defendants, including the Petitioner.  (Id. at 207).

The Trial Court entertained challenges to jurors for

3

cause from the Prosecution and each defense counsel individually. (Id. at 212-14). The parties were then asked for their peremptory challenges. At the end of the first panel, eight jurors were selected, none of whom were African-American females.

A second panel of 26 jurors was then questioned. (Id. at 220-341). The Trial Court excused one prospective juror for cause. (Id. at 361). After a set of peremptory challenges from the parties, Dolcine Monk ("Ms. Monk"), a South American woman from Suriname, was seated on the jury. (Id.). The Prosecution then challenged April Curry ("Ms. Curry"), the last African-American female remaining in the venire. (Id. at 369).

Petitioner made an objection to the Trial Court based on Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986), and stated:

> At this point we make a Batson challenge to the People's response. If you go back to the first panel, they bounced every African American female or I shouldn't say -- ethnic female and the only one in this panel that they kept was Ms. Monk. Now we're at Ms. Curry. The first panel there was no outstanding issue that we could find for the reasons they bounced her. I ask that they give a reason for why they're bouncing all the African American females . . . .

(Id. at 369-70).

Touger narrowed the objection by listing each of the African-American female prospective jurors that the People had challenged. Counsel stated that the "[o]nly one they kept was Dolcine Monk," a sworn juror, whom he characterized as "although black [ ] in color, is from Suriname, which is not even, I mean, it's a South American country. Just even 80 percent would be, I think, qualify under Batson." (Id. at 370).

The Trial Court listed the Prosecution's use of peremptory strikes against women in both panels, noting that the People had peremptorily challenged six white females and stated that "there's a certain percentage of challenges that the People have exercised either to black jurors wherever they may come from and an Hispanic female juror." (Id.). The Petitioner's counsel stated, "that's four out of five of the young, younger female blacks, and there's a broader pattern of all females, but certainly is a distinct pattern of female black." (Id.).

The Trial Court then asked if Petitioner's Batson challenge rested on the class of black women, and counsel agreed. (Id. at 371-72). The Trial Court also noted that "the

5

case law on that subject is interesting," and observed that "it pretty much comes down to exactly what you've alleged with regard to the use of peremptory challenges . . . And I don't believe you have gone." (Id. at 372).  Touger then explained that, "of the five female blacks put forth on these panels, [the Prosecution] bounced four of them.  The case law . . . is clear that four out of five is enough of a percent and a percent of ten out of eleven of females bounced is certainly enough of a percent." (Id.).  Another defense attorney added that, "we have virtually an all white jury.  The challenges have been used to remove people of color, all of them." (Id.).  The Trial Court responded:

> . . . when you say all of them . . . you have to include then Ms. Christian in seat 4, despite her last name, I wrote, I indicated, at least to me, she's a female Hispanic.  She was challenged by the defense peremptorily.  Ms. Matos Guzman was challenged by the defense peremptorily.  Mr. Cao was a male Asian challenged by the defense peremptorily.  He's not a Caucasian; although, he might be classified that way, who knows, by what bureau of the Government, but, could be considered a person not white.  Ms. Meyers, female black challenged by the defense peremptorily. I think that's about it.

(Id. at 372-73).

The Trial Court noted that of the five black females on the panels, the defense removed Mira Meyers ("Ms. Meyers").

(Id. at 373).  The Trial Court stated that "there have not been
presented to me sufficient facts to make out a pattern of the
purposeful use of peremptory challenges to which [sic] include a
recognizable group."  (Id.).  Touger explained that Ms. Meyers
was stricken because she had worked for the Police Academy.
(Id.).  The Trial Court told Touger that he did not have to
provide any reason for his challenge, but counsel nonetheless
continued, "I think the record has to be clear, there was a
clear reason why Ms. Meyers was bounced[;] she worked for the
Police Academy." (Id. at 373-74).

          Petitioner's counsel then reiterated his earlier
argument asking for the Prosecutor to provide a race-neutral
reason for the peremptory challenges. (Id. at 392).  The Trial
Court responded that "[t]he only reason I went through the rest
of the challenges was that one of the defense counsel[ ] made a
statement I think that required some explanation for the record
in the event the record is later on examined." (Id. at 374).
None of the defense counsel asked to place any other relevant
facts on the record and the Trial Court moved on to conduct the
rest of the voir dire.  At no later point did the defense raise
the Batson issue or seek to supplement their arguments.

7

**B) Jury Deliberations**

At trial, the People presented witnesses and documentary evidence in support of the charges in the indictment.  The jury began its deliberations on the morning of December 12, 2006.  (Id. at 664).  It sent various notes that day seeking instructions.  (Id. at 669-72).  When the Trial Court excused the jury that day, it had been deliberating for "somewhat over five hours," excluding the time taken for reinstruction. (Id. at 719).

The following day, deliberations were curtailed because the Petitioner went to the hospital. (Id. at 792-99).  In the meantime, the jury sent two notes at 1:21 p.m. (Id. at 788).  One read: "If we cannot deliberate with a juror or if there was any violation of the laws because quote, that's the way business is done, unquote, do we continue?" (Id. at 788, 795).  The other read: "Does juror number three have a right to vote not guilty without being slanderized?" (Id. at 779, 785).  Although counsel began to discuss these notes, the matter was tabled until Petitioner returned.  (Id. at 778-86).  Thus, the jury was excused without any response, after having deliberated for approximately 3 1/2 hours. (Id. at 790).

8

On December 15, 2006, the Trial Court and counsel discussed the two notes from Wednesday.  (Id. at 820-35). Petitioner's counsel stated that "it's not as if we were getting notes about a deadlock," and pointed out that there was no reason to assume that "juror number three has a problem" just because some jurors "on one side" might "feel that [she] is not following the law."  (Id. at 827-828).  Defense counsel stressed that "[t]here may be other reasons, other – why she is voting not guilty.  She may have a reasonable doubt with respect to something else."  (Id. at 827).

At approximately 10:35 a.m., the Trial Court addressed the jury, and reminded it that "each juror must decide the case for himself or herself after a fair consideration of the evidence with one's fellow jurors" and stressed that they should conduct these discussions "in a reasonable and polite manner" (Id. at 837-38).  The Trial Court also explained that it was "not uncommon for a jury that starts deliberating to have difficulty initially in reaching a unanimous verdict" or even to have moments when they "believe that they will never be able to reach a unanimous verdict" (Id. at 838-39).  As to the question, "Do we continue?" the Trial Court answered, "Yes, you do

9

continue to deliberate." (Id. at 839).

The Trial Court stated:

Now deliberation means that you should discuss the
evidence and consult with each other about the
evidence in the case, listen to each other, give each
others views careful consideration, give the views of
others careful consideration and you should reason
together when considering the evidence and when you
deliberate you should do so with a view toward
reaching an agreement, if that can be done, without
surrendering individual judgment.  But you must not
deliberate with a closed mind, nor should you ignore
my instructions on the law which all jurors are
obligated to follow.

Each of you must decide the case for yourself but only
after a fair and impartial consideration of the
evidence and the law with your fellow jurors.  You
should not surrender an honest view of the evidence
simply because you want the trial to end or because
you're out voted, but at the same time you should not
hesitate to re-examine your views and change your mind
if you become convinced that your position is not
correct.

As members of the jury I appreciate that the process
of jury deliberation can be difficult.  It can be
contentious and it can be intense and frankly, it
wasn't really contemplated to be an easy process, and
deliberations that are contentious and intense or
difficult are contemplated in the very notion of jury
deliberation.  However, I point out to you that you
cannot be compelled to reach a verdict, but when you
deliberate in a case just keep in mind that any
rudeness towards each other must be avoided.  Any
harshness of language must be avoided.  Any name
calling must be avoided with any deliberating jury
because that sort of conduct between deliberating
adults is counterproductive.  It only leads people to
shutting down, not using common sense, logic and

reason.  So you must show respect for each other as
individuals in your deliberations because each juror
deserves that respect in these deliberations in this
case.

(A. at 839-41).

Touger immediately objected to the Trial Court's
instructions, arguing that "[o]n every level of your charge it
was directed that juror number three should give it up and
change her view and I would object to the wording of the charge
and the general nature of it."  (Id. at 842).  Defense counsel
also requested that the jury be reinstructed, but the Trial
Court declined reinstruction.  (Id. at 843).

The jury began deliberating at 10:45 a.m. (Id. at
842).  Around noon, they asked for instructions on the Donnelly
Act, (Id. at 865-76), and then deliberated until they were
dismissed for the weekend (Id. at 878, 887-90), after
deliberating for about 6 1/2 hours that day. (Id. at 896).

On Monday, December 18, 2006, at about midmorning, the
jury sent three notes. (Id. at 892).  One, marked at 10:40 a.m.,
read:  "we have one juror who will not discuss the evidence and
is basing conclusions on emotional concerns such as union
involvement in cleaning up 9/11.  We cannot proceed."  (Id. at

11

893). The second, marked at 10:45 a.m., read: "we the jury are deadlocked on all counts, and deliberations seems pointless" (Id.). The third, marked at 10:55 a.m., read:

> As we began the deliberation on Tuesday, juror number three made several statements that left us concerned about our ability to continue. I am reluctant to reveal those statements, however I can say that her words conveyed a violation of the jury instruction and her oath as a juror. For this reason, we have made no progress and see no hope for a conclusion. Additionally, this juror will not engage in deliberation or discussion. We are deadlocked.

(Id.).

Counsel for Garito moved for a mistrial and the Petitioner joined in the motion. (Id. at 895-96). The Trial Court concluded that it was too soon for that drastic remedy, as the jurors had been deliberating for approximately 15 to 16 hours, which was not considered extensive in a multiple-defendant case of this length and complexity. (Id.). The Trial Court then delivered a modified Allen charge, stressing that the verdict must represent the considered judgment of each separate juror (Id. at 914), and that it should be based on the law and the evidence, but nothing outside the law and the evidence. (Id. at 915). The Trial Court reminded the jurors of their duty to consider each other's views and to reach agreement if they could

12

do so "without violence to individual judgment or without surrendering your individual judgment." (Id. at 915-16).   The Trial Court cautioned them against allowing pride to block their interactions with each other, but also stressed, as well, that no one should surrender any honest convictions about the evidence. (Id. at 917).   The Trial Court instructed the jury to send another note if there was any way it could help and directed them to "try to deliberate with each other with regard to any defendant or charges or charge in this case." (Id. at 918).

At 2:40 p.m., the parties convened to discuss two notes that arrived during lunch. (Id. at 923).   The first - marked at 12:35 p.m. asked for "the law's definition of a bribe" (Id.).   The second, marked at 1:55 p.m., read:   "Despite the judge's further instructions we are still hopelessly deadlocked on every charge.   Further deliberation is most certainly futile" (Id.).   As the parties reviewed these notes, a third note, marked at 2:40 p.m., arrived and read:   "As previously stated, one juror will not follow the Court's instructions.   Can you repeat the instructions that explain how we are required to apply the law as pertains to the charges and the evidence?" (Id. at 924-27).   Five minutes later, there was a fourth note, marked

13

at 2:45 p.m., which read:  "Juror number three will not comply with your instructions despite our best efforts.  We are at an impasse." (Id. at 930).


        Defense counsel again moved for a mistrial and argued that the Trial Court's proposed Allen charge was coercive and prejudiced against Juror Three.  (Id. at 931-35); Allen v. United States, 164 U.S. 492, 17 S. Ct. 154, 41 L. Ed. 528 (1896).  The Trial Court again denied the motion and addressed the jury at 3:05 p.m. (A. at 935-36).  The Trial Court provided the bribe-receiving instructions the jury had sought (Id. at 938-42), and then delivered the Allen charge. (Id. at 942-48). In response to the other two notes, the Trial Court reminded the jurors of the commitment they had made to reason and deliberate together (Id. at 947), of "the dichotomy between your decision on the facts of the case and your decision on what the law is," and of their duty to "follow the law as I instructed you on it, and not follow what you may personally think or believe the law is or should be." (Id. at 949).  Defense counsel again objected that the Allen charge was coercive and that it failed to mention that the jury could base its verdict on the lack of evidence presented.  (Id. at 949-50).


                    14

The jury retired to the jury room, and at about 4:00 p.m., sent another note, which read:

> [O]ne juror is making her decisions based on a broad ideological stance unrelated to the facts of the case. She has made such statements as, 'Things like this should be decided by the Legislature, not by the court.' Your instructions are being ignored by one individual. It is making a mockery of our efforts.

(Id. at 950, 961).

During the discussion of this note, another noted, marked at 4:27 p.m., arrived. (Id. at 958). It read:

> [W]e are not one small bit closer to agreement on then charges than we were fifteen minutes into deliberation. It is obvious to all that the differences that exist will not be overcome with more time. To continue to discuss the facts in the case is pointless when there is a viewpoint that feels that regardless of the facts, no laws were broken.

(Id. at 958-59, 966).

The Trial Court offered to tell the jury that "whatever their position, they should know that the laws come from the Legislature, which has enacted the Penal Law and General Business Law, and that no one should ignore the instruction of the Court." (Id. at 951-52). The defense counsel objected to the Trial Court's proposal, arguing that the Trial Court would essentially be telling one juror that she was

15

wrong. (Id. at 953-57, 959).  At one point in the discussion, the Trial Court commented, "It's interesting that if we were at an earlier stage of the trial where even if the case were on trial, we were faced with this type of situation, it would be clear to me that we're dealing with a juror who is grossly unqualified to serve." (Id. at 959).  Defense counsel responded, "It seems to me, your Honor, the only way [juror three] becomes qualified in your point of view, then, [is] if she votes guilty. If she votes guilty, she becomes qualified.  If she votes not guilty, she's not qualified.  It can't be both ways" (Id. at 963).  The Trial Court commented:  "You know you keep addressing that issue in that particular way.  I don't -- " (Id.).  Counsel interrupted with the assertion, "You say she's not qualified --" and then another defense lawyer interrupted him to discuss the wording of the supplemental charge. (Id.).

The Trial Court again denied defense counsel's mistrial motion and instructed the jury one more time. (Id. 962-63).  The Trial Court told the jury that the laws that "I have instructed you on, the crimes charged, whether they're from the Penal Law or from the General Business Law, were all enacted by the Legislature.  So the Legislature enacted the laws." (Id. at 966).  In addition, the Trial Court complimented the jurors and

16

noted that they had been "deliberating diligently, with
seriousness and [for a] significant and substantial period of
time" (Id. at 967), and offered three choices:  (1) they could
break "now, [at] 5 to 5" and return the next day or (2) keep
working for a few hours over dinner, or, (3) "if you feel that
neither of those choices would be helpful or might result in a
unanimous verdict, if you feel as a jury that neither choice is
an acceptable choice, then send me a note, and tell me your
situation as a deliberating jury." (Id. at 967-69).  In a note
marked 5:00 p.m., the jury chose the second option, stating that
they wanted to continue working until 8:00 p.m. (Id. at 969).

          Two hours and 15 minutes later, the jury sent out two
final notes, each announcing that they had reached a verdict.
(Id. at 970-71).  The first note, marked at 7:15 p.m. read:  "we
the jury have reached verdicts on all counts." (Id. at 970-71).
The other note, marked at 7:20 p.m. read: "after much careful
and thorough deliberation, I am happy to announce we have
reached unanimous verdicts on all counts.  All jurors kept open
minds and [were] able to put aside their differences." (Id. at
971).

          On December 18, 2006, during the fourth day of

                              17

deliberations, the jury acquitted Garito and Errante, and acquitted Esposito of some counts, while convicting him of the antitrust count and four counts of bribe-receiving. (Id. at 991-98). The jury acquitted the Petitioner of some counts, but found him guilty of enterprise corruption and 21 other felony counts.

On February 6, 2007, the Trial Court sentenced Petitioner to an aggregate prison term of six to 18 years.

## C) **State Appellate Proceedings**

In March 2008, Touger filed a brief on Petitioner's behalf in the Appellate Division, First Department (the "Appellate Division"). (State's Ex. A). Petitioner argued that: (1) the Trial Court violated the Petitioner's equal protection rights when it found that counsel had not made a prima facie case of discrimination sufficient to meet his burden under Batson v. Kentucky, 476 U.S. 79, 106 S. Ct. 1712, 90 L. Ed. 2d 69 (1986); (2) the Trial Court erred in not declaring a mistrial after the jury sent eight hung jury notes in one day; (3) the Trial Court erred in not declaring a mistrial when it found that a deliberating juror was grossly unqualified to serve as a

18

juror; (4) the People failed to prove the continuity element of the enterprise corruption charge; and (5) the Trial Court improperly instructed the jury in Petitioner's absence. (Id.). The People filed a responding brief, and Petitioner filed a reply. (See State's Exs. B, C).

On May 21, 2009, the Appellate Division affirmed Petitioner's conviction, over the dissent of Justice James M. Catterson. People v. Guardino, 62 A.D.3d 544, 880 N.Y.S.2d 244 (1st Dep't 2009) (Guardino I). Specifically, the Appellate Division found that the Trial Court had properly denied Petitioner's Batson application, because it was "limited to a numerical argument, i.e., that four of the six black female prospective jurors had been stricken by the prosecutor." (A. at 1080).

The Appellate Division reasoned that of the "six black women in question, four were peremptorily challenged by the People, one was stricken by the defense and one was seated." Guardino I at 545. The court acknowledged that a numerical argument could give rise to a prima facie showing of discrimination, but that "numbers alone" did not automatically establish that showing. Id. at 545-46 (citations omitted). The

19

court stated that the Petitioner had failed to provide "any other factors" and his numerical argument was not supported "'by factual assertions or comparisons that would serve as a basis for a prima facie case of impermissible discrimination.'"  Id. at 546 (quoting People v. Brown, 97 N.Y.2d 500, 508 (2002)).

The Appellate Division next held that the Trial Court had properly denied the Petitioner's requests for a mistrial during the last day of deliberations in this "six week trial involving complex evidence and charges."  Guardino I at 546. The court explained that the Trial Court had properly responded to jury notes reporting a deadlock and requesting additional instructions "by first giving a modified Allen charge encouraging a verdict, then a full Allen charge, and finally asking the jury to report whether or not, in light of additional instructions concerning applicable law, it wanted to continue deliberating . . . ."  Id. at 546.  In doing so, the Appellate Division found that the Trial Court had "cautioned jurors not to surrender their conscientiously held beliefs, and there was nothing coercive in any of its instructions."  Id. (citations omitted).

The Appellate Division explained that "[e]ven though,

according to the jury's notes, one juror was unwilling to apply
the law to the facts, there was no basis for finding the juror
grossly unqualified (see C.P.L. § 270.35(1)), simply on the
basis of the notes, without making an inquiry.  However, the
Petitioner never requested an inquiry, but merely reiterated his
request for a mistrial.  In addition, the court rejected the
Petitioner's claims that he was entitled to be present during a
ministerial act, and that the evidence of criminal enterprise
was legally insufficient.  Id. at 546.


         In dissent, Justice Catterson found that the
Petitioner had "made out a prima facie case of racial
discrimination which required the prosecutor to give racially
neutral reasons for peremptorily excluding four out of the six
black female panelists."  Id. at 548.  The dissent believed that
it was "necessary to address whether a group of black females is
a 'cognizable racial group,' for the purposes of a Batson
challenge," and agreed with the Petitioner that there was a
"'pattern of strikes' against black females" sufficient to
establish a prima facie case.  Id. at 549-50.


         Petitioner obtained leave to appeal to the New York
Court of Appeals, (State's Exs. E, F), and filed a brief in

21

which he raised the Batson claim as well as the mistrial and
supplemental instruction claims. (State's Ex. I). The People
filed a brief in opposition, and the Petitioner replied.
(State's Exs. J, K).

On November 30, 2010, the New York Court of Appeals
(the "Court of Appeals"), having heard the Petitioner's appeal
in conjunction with several other appeals, affirmed the judgment
of conviction. People v. Hecker, 15 N.Y.3d 625, 917 N.Y.S.2d 39
(2010) (Guardino II). The Court of Appeals found that the
Petitioner's counsel had failed to establish a prima facie case
under the first step of the Batson inquiry. Id. at 652-53. The
court stated that when co-defense counsel made the Batson
application, counsel "made no record of the racial or gender
composition of the remaining venire nor did they articulate
other facts or circumstances that, in their view, gave rise to
an inference of discrimination." Id. at 653. Rather, counsel
argued that the Prosecutor had challenged four black women. Id.
The Trial Court explained that defense counsel had struck one of
the black female panelists, and that of the 11 females that the
Prosecutor had peremptorily struck, seven were white. Id. The
court further reasoned that "at the time of the Batson
challenge, 37 jurors -- 15 male and 22 females -- were subject

22

to the parties' peremptory challenges.  Six of these females
were African-American.  The People used 11 of their 12
peremptory challenges to remove females, four of whom were
African-American.  The 12-person jury ultimately selected by the
parties from this group consisted of five females, one of whom
was African-American."  Id.

        The Court of Appeals explained that this was not a
case where "numerical assertions alone" was sufficient to
establish a prima facie case of discrimination and was unlike
"the many cases where this Court and the United States Supreme
Court have held that total exclusion of a cognizable group would
give rise to an inference of discrimination."  Id. at 654.  The
court stated that in cases where the court had found a prima
facie showing of discrimination absent a 100 percent exclusion
rate of a cognizable group, the movant had pointed to other
record facts to support their case.  Id.  However, the court
noted that, here, the Petitioner had not "articulate[d]
additional factors as part of his step one prima facie showing."
Id.

        The Court of Appeals also acknowledged that while the
Supreme Court no longer required a Batson movant to show that

23

the defendant is a member of the same cognizable group that an
attorney aimed to exclude, that sameness "remains a factor in
evaluating whether the totality of the circumstances gives rise
to a showing of purposeful discrimination." Id. at 654 (citing
Powers v. Ohio, 499 U.S. 400, 111 S. Ct. 1364, 113 L. Ed. 2d 411
(1991)). The court added that the defense "neither argued that
the People treated the four African-American challenged
panelists disparately vis-à-vis the unchallenged prospective
jurors nor did they suggest that the People excluded this
cognizable group because they would, for some reason, be more
favorably disposed to the defense position." Id. Finally, the
court held that the Trial "Court properly instructed the jury
during its deliberations and was justified in denying
[Petitioner's] mistrial motions." Id.

Thereafter, the Petitioner, though his counsel, filed
the instant petition on September 26, 2011, contending that the
state court's Batson ruling was erroneous, that its Allen
charges were coercive, and that the Trial Court erred in not
declaring a mistrial when it found the sole minority juror was
grossly unqualified, including when the jury declared itself
deadlocked several times during the last day of deliberations.
(Petition at ¶ 12). The Petition was opposed by the Respondent

24

and marked fully submitted on January 11, 2012.

## II. __Discussion__

### A) __The Petition Is Timely__

As a threshold matter, a habeas petitioner has one year from the date his conviction becomes final to file his petition for habeas relief.  28 U.S.C. § 2244(d)(1).  The one-year period serves the "well-recognized interest in the finality of state court judgments."  Duncan v. Walker, 533 U.S. 167, 179, 121 S. Ct. 2120, 150 L. Ed. 2d 251 (2001).

Here, the Court of Appeals affirmed Petitioner's conviction on November 30, 2010, and his conviction became final 90 days later, on March 1, 2011.  See Williams v. Artuz, 237 F.3d 147, 151 (2d Cir. 2001).  Consequently, the Petitioner has until March 1, 2012 to file his habeas petition.  The instant petition was filed on September 26, 2011 and therefore timely.

### B) __The Petitioner's Claims Have Been Exhausted__

A federal court may not consider the merits of a claim

25

unless that claim was fairly presented in federal constitutional terms to the "highest state court from which a decision can be had." Daye v. Att'y Gen. of New York, 696 F.2d 186, 190 n.3 (2d Cir. 1982) (en banc). "In order to have fairly presented his federal claim to the state courts the petitioner must have informed the state court of both the factual and the legal premises of the claim he asserts in federal court." Id. at 191. To present the legal basis of a federal claim to the state courts, a petitioner need not cite "book and verse on the federal constitution," but may instead, for example, rely on federal constitutional precedents, claim "the deprivation of a particular right specifically protected by the Constitution," or cite state precedent that "employs pertinent constitutional analysis." Id. at 192-94.

Here, the Petitioner raised his Batson, Allen and most of the related mistrial-based-on-jury-deadlock claims in his Appellate Division and Court of Appeals briefs in federal constitutional terms by citing to Supreme Court cases in support of these claims. (See State's Exs. A, I).

Petitioner did not, however, raise, in federal constitutional terms, his claim that the Trial Court should have

26

granted a mistrial once it purportedly found that a juror was grossly unqualified.  Instead, the Petitioner based his argument on C.P.L. § 270.35(1).  (State's Ex. I at 50-56).  The Petitioner cannot now raise his "grossly unqualified juror" claim in state court because he has already had the one appeal to which he is entitled.  Moreover, a federal court would be constrained to deny the claim because the Petitioner could have raised it in a constitutional fashion on appeal.  See C.P.L. § 440.10(2)(c).  Thus, this Court can deem the claim exhausted, but procedurally barred.  See Ramirez v. Attorney General, 280 F.3d 87, 94 (2d Cir. 2001) (stating that "[e]ven if a federal claim has not been presented to the highest state court or preserved in lower state courts under state law, it will be deemed exhausted if it is, as a result, then procedurally barred under state law.").

The Petitioner's procedurally defaulted claim may be reviewed by this Court only if he can demonstrate either: (1) "cause" for the default and actual "prejudice" from barring the claims, or (2) that the failure to consider the claims will result in a "fundamental miscarriage of justice."  Murray v. Carrier, 477 U.S. 478, 485, 496, 106 S. Ct. 2639, 91 L. Ed. 2d 397 (1986).  In determining if cause exists for the procedural

27

default, courts must be careful to limit their inquiry to external factors that inhibited the Petitioner or his counsel from asserting the claim.  Id. at 492.  A "fundamental miscarriage of justice" has been described as an "extraordinary case where a constitutional violation has probably resulted in the conviction of one who is actually innocent."  Sawyer v. Whitley, 505 U.S. 333, 338-39, 112 S. Ct. 2514, 120 L. Ed. 2d 269 (1992).

        The Petitioner has not provided cause for his failure to exhaust the grossly unqualified juror claim.  Accordingly, this Court need not consider whether Petitioner would suffer any actual prejudice from barring this claim.  Stepney v. Lopes, 760 F.2d 40, 45 (2d Cir. 1985).  The Petitioner also has not offered any new evidence to support a finding that there was a fundamental miscarriage of justice, so that he would not be entitled to federal habeas corpus review of his procedurally barred claim under that exception.  See Schlup v. Delo, 513 U.S. 298, 324-25, 115 S. Ct. 851, 130 L. Ed. 2d 808 (1995).

## C) The Standard of Review

        Section 2254 of the 1996 Antiterrorism and Effective

28

Death Penalty Act (the "AEDPA") provides a federal remedy for state prisoners if their continued custody is in violation of federal law.  Pub. L. No. 104-132, 100 Stat. 1214, codified at 28 U.S.C. § 2254 (a); see Chandler v. Florida, 449 U.S. 560, 571, 101 S. Ct. 802, 66 L. Ed. 2d 740 (1981) ("This Court has no supervisory authority over state courts, and, in reviewing a state court's judgment, we are confined to evaluating it in relation to the Federal Constitution.").

Thus, a petitioner can only obtain habeas corpus relief by showing that the state court decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or was based on "an unreasonable determination of the facts in light of the evidence presented in the State court proceeding."  28 U.S.C. § 2254(d)(1)-(2).

With respect to the "contrary to" clause, the writ may issue in two circumstances:  first, if the state court decision "applies a rule that contradicts the governing [Supreme Court] law"; and second, if the state court decision addresses a set of facts "materially indistinguishable" from a relevant Supreme Court case and arrives at a result different to that reached by

29

the Court. Lockyer v. Andrade, 538 U.S. 63, 73, 123 S. Ct. 1166, 155 L. Ed. 2d 144 (2003), (quoting Williams v. Taylor, 529 U.S. 362, 405-06 (2000)). The "clearly established Federal law" refers to Supreme Court holdings, as opposed to the dicta, as of the time of the relevant state court decision. See Williams, 529 U.S. at 412.

A state court decision involves an "unreasonable application" of Supreme Court precedent when the state court either "identifies the correct governing legal rule" from the Supreme Court's cases but "unreasonably applies it to the facts" of the case, or "unreasonably extends a legal principle from [the Court's] precedent to a new context where it should not apply or unreasonably refuses to extend that principle to a new context where it should apply." Id. at 407.

Under the "unreasonable application" clause, "a federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the state-court decision applied clearly established federal law erroneously or incorrectly." Id. at 411. "Rather, it is the habeas applicant's burden to show that the state court applied [Supreme Court precedent] to the facts of his case in an objectively

30

unreasonable manner." Woodford v. Visciotti, 537 U.S. 19, 25, 123 S. Ct. 357, 154 L. Ed. 2d 279 (2002).  Any determination of a factual issue made by a state court must be presumed correct unless the petitioner can show by clear and convincing evidence that such presumption should not apply.  See 28 U.S.C. § 2254(e)(1).

In addition, the Supreme Court's jurisprudence on the "unreasonable application" clause of § 2254(d)(1) makes "clear that whether a state court's decision was unreasonable must be assessed in light of the record the court had before it." Holland v. Jackson, 542 U.S. 649, 652, 124 S. Ct. 2736, 159 L. Ed. 2d 683 (2004).  In Cullen v. Pinholster, the Court recently emphasized that, "[i]f a claim has been adjudicated on the merits by a state court, a federal habeas Petitioner must overcome the limitation of § 2254(d)(1) on the record that was before that state court."  --- U.S. ----, 131 S. Ct. 1388, 1400, 179 L. Ed. 2d (2011).

When a state court's Batson ruling is challenged under 28 U.S.C. § 2254, the Court "will not identify constitutional error unless the record 'compel[s] the conclusion that the trial court had no permissible alternative but to reject the

31

prosecutor's race-neutral justifications.'" Watson v. Ricks, 427 F. App'x 60, 61 (2d Cir. 2011) (alteration in original) (quoting Rice v. Collins, 546 U.S. 333, 341, 126 S. Ct. 969, 163 L. Ed. 2d 824 (2006)).

## D) **The Clearly Established Federal Law: Batson v. Kentucky and Its Progeny**

Batson established a three-step burden shifting mechanism for evaluating allegations of race discrimination during jury selection at a criminal trial.  In determining whether a prosecutor's peremptory challenge was based on race, the party objecting to the peremptory challenge must make a prima facie showing that the peremptory strikes were purposely used to exclude members of a cognizable group. Batson, 746 U.S. at 96.  Only if a prima facie case of discrimination is found does the burden shift to the prosecutor to articulate a race-neutral explanation for the strike. Id.  This second step of the process "does not demand an explanation that is persuasive, or even plausible . . .  the issue is the facial validity of the prosecutor's explanation.  Unless a discriminatory intent is inherent in the prosecutor's explanation, the reason offered will be deemed race neutral." Purkett v. Elem, 514 U.S. 765, 768, 115 S. Ct. 1769, 131 L. Ed. 2d 834 (1995).  Finally, once

32

those reasons have been provided, the court must weigh the
evidence and determine if the objecting party has met his burden
of persuasion that the peremptory strike was motivated by
unlawful discrimination, not the proffered neutral explanation.
Batson, 476 U.S. at 97-98.

While there is no "bright-line rule for determining
what constitutes such a prima facie case," Brown v. Alexander,
543 F.3d 94, 101 (2d Cir. 2008), judges ruling on a Batson claim
typically examine "the totality of the relevant facts" and "all
relevant circumstances" to determine whether they give rise to
an inference of discriminatory purpose.  Batson, 476 U.S. at 93-
94.  Relevant facts may include: (1) a disproportionate pattern
of strikes against members of the group, (2) questions or
statements displaying bias, (3) the exclusion of members of the
group who might be expected to be favorably disposed to a party,
or (4) evidence that a party excused members of the group while
retaining other jurors with similar backgrounds and
characteristics.  See Batson, 476 U.S. at 97.

The first step of the Batson inquiry is not an
"onerous" one and "a prima facie case of discrimination can be
made out by offering a wide variety of evidence, so long as the

33

sum of the proffered facts gives rise to an inference of discriminatory purpose." Alexander, 543 F.3d at 101. "Ultimately, though, Batson left substantial discretion in the hands of the trial court, expressing 'confidence that trial judges, experienced in supervising voir dire, w[ould] be able to decide if the circumstances concerning the prosecutor's use of peremptory challenges create[d] a prima facie case of discrimination." Id. at 101 (quoting Batson, 476 U.S. at 97).

In addition, the Second Circuit has held that while "no doubt that statistics, alone and without more, can, in appropriate circumstances, be sufficient to establish the prima facie showing," Overton v. Newton, 295 F.3d 270, 278 (2d Cir. 2002), the Court has also "made clear, however, that '[o]nly a rate of minority challenges significantly higher than the minority percentage of the venire would support a statistical inference of discrimination.'" Alexander, 543 F.3d at 101 (quoting United States v. Alvarado, 923 F.2d 253, 255-56 (2d Cir. 1991)). Thus, "in every case, an assessment of the sufficiency of a prima facie showing in the Batson analysis should take into consideration all relevant circumstances including, but not restricted to, the pattern of strikes." Id. (citation and quotation omitted).

34

### E) The Court of Appeals Batson Determination Was Not Objectively Unreasonable

The Petitioner maintains, as he did in the Appellate Division and the Court of Appeals, that the Prosecutor exercised peremptory challenged in a discriminatory manner in violation of Batson. He argues that the state courts failed to address his argument that African-American females are a cognizable group for Batson purposes. (Pet. Memo at 46). Instead, the Petitioner contends that the Court of Appeals "imposed a quantum of proof to establish a prima facie case that is contrary to the minimal burden established by Batson and its progeny and that reproduces discrimination in the jury selection process on the basis of a Batson challenger's race and gender," and applied Batson's minimal burden unreasonably. (Id.). In essence, the Petitioner argues that the court misunderstood the first step of the Batson procedure for determining the validity of peremptory challenges by applying a standard in which "statistics alone and without more are never sufficient to establish a prima facie case, unless the striking party excludes all members of the cognizable group." (Id.).

In reaching its decision, the Court of Appeals

35

evaluated the numerical assertions set forth by the defense and the corrections made by the Trial Court. Guardino II, 15 N.Y.3d at 653. The court noted that, at the time of the Batson challenge, 37 jurors consisting of 15 males and 22 females, were subject to peremptory challenges. Id. It found persuasive that the defense struck one of the African-American female panelists and that of the 11 females that the People peremptorily struck, seven of them were white. Id. Thus, before the Prosecutor exercised his challenges, there were six black women in the pool who constituted 16.21% of the 37 potential jurors. Once the People exercised its challenges, two black women remained eligible to serve on the jury, which would have accounted for 16.66% (or two out of twelve) of a potential jury had they been selected. The Court also reasoned that the "racial identity" factor was absent here, and stated that in "evaluating this factor, we note that the defense neither argued that the People treated the four African-American challenged panelists disparately vis-à-vis the unchallenged prospective jurors nor did they suggest that the People excluded this cognizable group because they would, for some reason, be more favorably disposed to the defense position." Id. at 654.

In addition, in Sorto v. Herbert, the Second Circuit

36

found that a when "a Batson prima facie case depends on a
pattern of strikes, a petitioner cannot establish that the state
court unreasonably concluded that the pattern was not
sufficiently suspicious unless the petitioner can adduce a
record of the baseline factual circumstances attending the
Batson challenge." 497 F.3d 163, 171 (2d Cir. 2007). Such
evidence would include "the composition of the venire, the
adversary's use of peremptory challenges, the race of the
potential jurors stricken, and a clear indication as to which
strikes were challenged when and on what ground, and which
strikes were cited to the trial court as evidence of
discriminatory intent." Id. at 172. Finding that the record
contained insufficient data as to the prosecution's strike
pattern, the Sorto court held that the petitioner had failed to
make his prima facie case even where the first few challenged
jurors suggested a discriminatory motive. Id. at 167-68, 172.

    Similarly, here, "[t]he defense made no record of the
racial or gender composition of the remaining venire nor did
they articulate other facts and circumstances that, in their
view, gave rise to an inference of discrimination." Guardino
II, 15 N.Y.3d at 653. As stated in Sorto, such a record is
necessary because, what may be "common knowledge in the

37

courtroom based on the shared perceptions of the lawyers and the trial judge," is unavailable to a reviewing court which "does not have the benefit of what can be observed by those in the trial courtroom." Sorto, 497 F.3d at 172.  Additionally, determining the rate of statistical disparity between the prosecutor's strikes and the venire "would require knowing the minority percentage of the venire."  Id. (citing United States v. Alvarado, 923 F.2d 253, 255 (2d Cir. 1991))


        The Petitioner argues that the Trial Court "cut off a fuller showing" by wrongfully requiring counsel to compare jurors and consider their pre-dispositions in making the step-one case, and any such requirement "is contrary to clearly established federal law." (Pet. Memo. at 66).  However, the record reveals that, during the Batson proceeding, defense counsel interrupted the court twice.  (A. at 389, 390).  When the court began to discuss what it thought the percentages indicated, counsel interrupted to reiterate his own views of the numbers. (Id. at 389).  When the court began to discuss what he believed about the defense showing, counsel interrupted, "[j]ust to make the record clear" (Id. at 390), and he then repeated the numerical argument he and another counsel had already made. (Id.).  After the court explained its view that counsel's

showing was inadequate, counsel continued to speak and repeated
the defense objection and wanted the court to order the People
to state the reasons for their peremptory challenges, (Id. at
391), and he continued on to make a record of the reasons the
defense had for challenging Ms. Meyers, rather than support for
his claim that the People had been acting improperly. (Id. at
391-92).

       In addition, while Batson movants are not required to
argue juror comparisons and pre-dispositions in support of a
motion, these factors are nevertheless "examples of evidence
that 'would [have] serve[d] as a basis for a prima facie case of
impermissible discrimination' had it been offered." Alexander,
543 F.3d at 104 (quoting Brown, 97 N.Y.2d at 508). The Court of
Appeals did not hold that these specific arguments were
necessarily required, instead it merely noted that defense
counsel did not put forth such evidence in support of his Batson
motion. Guardino II, 15 N.Y.3d at 653-54.

       To further advance his contention, the Petitioner
cites to Tankleff v. Senkowski, in which the prosecutor removed
two of the three black prospective jurors, then removed the
third and last black juror before agreeing to allow him to serve

39

as a fourth alternate.  135 F.3d 235, 247 (2d Cir. 1998).  When

Tankleff's trial counsel objected to each of the prosecution's

use of their peremptory strikes, the trial court "cut off" the

defense by noting that the "[Tankleff] obviously is not black"

and therefore could not raise a Batson challenge.  Id.  The

Second Circuit noted that, because the trial court improperly

truncated counsel's argument, the record could not reflect "how

many members how many members of the cognizable racial group are

in the venire panel from which the petit jury is chosen, the

pattern of strikes against the racial group jurors in the

particular venire, the prosecutor's statements and questions

during jury selection, as well as any other relevant

circumstance."  Id. at 249 (citing Batson, 476 U.S. at 97).


        Here, there is no indication that the Trial Court

truncated the Petitioner's argument because the Petitioner was

not of the same race or gender as the stricken venire.  In

addition, the State mentions that the Petitioner is a white

male, and therefore neither black nor female, to demonstrate

that "the People's challenges were not motivated by a stereotype

that all members of a defendant's 'group' will tend to vote in

his favor.  (State's Opp. at 26); see Tankleff, 135 F.3d at 249

("In considering whether a defendant has made out a prima facie

case . . . courts should consider how many members of the cognizable racial group are in the venire panel from which the petit jury is chosen, the pattern of strikes against racial group jurors in the particular venire, the prosecutor's statements and questions during selection, as well as any other relevant circumstances."). As the Court of Appeals accurately noted, "one of the factors that is relevant to a court's prima facie determination, in the context of a Batson challenge raised by the defense, is whether a defendant is a member of the same cognizable group the People are aiming to exclude." Guardino II, 15 N.Y.3d at 654. Petitioner, then and now, does not point to anything in the nature of the crime or evidence that supported an inference that some stereotype or generalization about a group may be at work.

Moreover, in Tankleff, the court found dispositive that the strike rate was essentially 100%, stating that "the fact that the government tried to strike the only three blacks who were on the panel constitutes a sufficiently dramatic pattern of actions to make out a prima facie case." Id at 249. Indeed, petitioners have often successful in establishing a prima facie case by "highlighting a 100% pattern" of exclusion against a group. Harris v. Kuhlmann, 346 F.3d 330, 346 (2d Cir.

41

2003); see also Green v. Travis, 414 F.3d 288, 299 (2d. Cir.
2005) (finding that the petitioner had established a prima facie
case of discriminatory intent where the prosecutor "had used one
hundred percent of her peremptory strikes to remove Blank and
Hispanic jurors). Sixty percent of the prosecutor's peremptory
challenges were used to exclude Hispanics. Furthermore, at the
time of the Batson challenge, the prosecution had stricken all
of the Black members of the jury pool not already struck for
cause."

In Harris, for example, the prosecutor initially
accepted a black juror, but was then permitted to exercise a
peremptory challenge against that juror when the juror belatedly
disclosed that he had previously been convicted of a misdemeanor
weapons offense. Id. at 339. The prosecutor then peremptorily
challenged the remaining four black men on the venire. Id. at
340. The Second Circuit found that "[t]hese five blacks
constituted the entire array of black prospective jurors. This
evidence was sufficient to make out a prima facie showing of
intentional discrimination." Id. at 343.

Citing Harris, Petitioner tries to raise his own tally
to 100% by arguing that the prosecutor "undoubtedly knew" that

42

counsel would strike Ms. Meyers, a black female with a pro-prosecution predisposition. (Pet. Memo. at 68-69). However, Petitioner never argued to the Trial Court that the Prosecutor's exclusion rate amounted to 100% because the prosecutor allegedly anticipated the defense strike against Ms. Meyers. (See A. at 373-74). Indeed, the Petitioner's claim that the Prosecutor "undoubtedly knew" the defense would strike Ms. Meyers is mere speculation and does not raise the strike rate to 100%.

The Petitioner also cites to Johnson v. California, 545 U.S. 162, 125 S. Ct. 2410, 162 L. Ed. 2d 129 (2005) for the proposition that courts should not require a Batson proponent to place "other factors" on the record to establish a prima facie case absent a 100% exclusion rate of a cognizable group. (Pet. Memo. at 57-58). In Johnson, the Court held that an inference of discrimination arose when the prosecutor struck all three of the prospective African-American jurors. Id. at 165, 173. After the prosecutor struck two of three prospective jurors, the inmate's counsel "made an additional motion the next day when the prosecutor struck the final remaining prospective black juror." Id. at 165. The Supreme Court found that these two events constituted "inferences that discrimination may have occurred [ ] sufficient to establish a prima facie case under

43

Batson." Id. at 173.


Here, in contrast, the Prosecutor did not strike all members of a cognizable class.  Although Petitioner characterizes the Prosecutor's strikes as "four out of five" black women, the record as created by Petitioner and on which the Batson motion was based, was a four out of six tally.  Thus, on this record, the Court of Appeals properly regarded Ms. Monk as a black female, because the Petitioner relied on her to assert his 80% argument to the trial court.  Whether viewed as a 67% or 80% exclusion, the Court of Appeals' rejection of Petitioner's claim was not "contrary to, [and did not] involve [ ] an unreasonable application of [ ] clearly established Federal law, as determined by the Supreme Court of the United States," 28 U.S.C. § 2254(d)(1), nor were they "based on an unreasonable determination of the facts in light of the evidence presented" in the trial court.  28 U.S.C. § 2254(d)(2).


The Petitioner argues that the Court of Appeals' holding would effectively "allow[ ] prosecutors to purposefully exclude every member of a cognizable group except one, if the defendant does not put 'other factors' on the record."  (Pet. Memo. at 58).  However, the court simply reiterated the by-now

44

familiar rules that statistics alone rarely evidence
discriminatory intent.  See, e.g., Butler v. Fischer, 345 Fed
App'x 642, 644 (2d Cir. 2009) (stating that "[a]lthough
statistical disparities are to be examined, courts must also
consider any other relevant circumstances.") (citations
omitted); Brown, 97 N.Y.2d at 507 (cautioning that purely
statistical arguments are "rarely conclusive in the absence of
other facts or circumstances."); People v. Childress, 81 N.Y.2d
263, 267 (1993) (finding that a disproportionate number of
strikes may be indicative of discrimination, but is "rarely
dispositive"); People v. Jones, 284 A.D.2d 46, 47 (1st Dep't
2001) (establishing a prima facie case "is not done by mere
reliance" on numbers "but depends upon proof of facts and
circumstances which establish intentional discrimination"),
aff'd sub nom People v. James, 99 N.Y.2d 264 (2002).


        Taken together, the Court of Appeals did not establish
a standard that "statistics alone and without more are never
sufficient to establish a prima facie case, unless the striking
party excludes all members of the cognizable group."  (Pet.
Memo. at 57, 59, 65).  Nor did the Court of Appeals require a
"higher quantum of proof" to establish the first Batson step, as
the Petitioner contends. (Id. at 59).  Instead, the court

45

reasonably applied and expressly relied on <u>Batson</u> and its progeny, and considered the totality of the relevant facts, before concluding that the Petitioner had not met his burden as "this is not the type of case where numerical assertions alone will give rise to a mandatory inference of discrimination." <u>Guardino II</u>, 15 N.Y.3d at 652-53.

## F) No Determination With Respect To A Cognizable Group Is Required

The question of whether African-American women are a cognizable group under <u>Batson</u> is not before this Court, and presents no federal constitutional question.  While <u>Batson</u> speaks to prohibiting racial discrimination, "federal law has not extended the <u>Batson</u> protection to <u>combinations</u> of race and sex."  <u>Sandy v. Donelli</u>, No. 05-1994(ENV), 2010 WL 2985651, at *5 (E.D.N.Y. July 21, 2010) (emphasis in original); <u>see</u> <u>Covington v. Lord</u>, 275 F. Supp. 2d 352, 359 (E.D.N.Y. 2003), aff'd 111 Fed. App'x 647 (2d Cir. 2004) ("The Supreme Court has not heretofore recognized that the combination of race and gender, such as 'black women,' may establish a cognizable group for <u>Batson</u> purposes.").

Furthermore, the Court of Appeals did not expressly

46

address the question, because it found that the Petitioner had

failed to establish a prima facie case under Batson using only

numerical arguments.  Guardino II, 15 N.Y.3d at 645-55.  At

most, and as Judge Smith pointed out in dissent, it "accept[ed]

the premise for the purposes of this case," but this premise "is

not obviously correct."  Guardino II, 15 N.Y.3d at 666.  This is

not a case where a court found no cognizable class and therefore

would not entertain counsel's prima facie argument; here, the

trial court acknowledged that Petitioner's motion was based on a

"female black" class, then entertained, and then rejected,

Petitioner's contention.  (A. at 372).


New York state courts have proceeded to the prima

facie issue regardless of whether the class is cognizable.  See,

e.g., People v. Harris, 55 A.D.3d 503, 504 (1st Dep't 2008)

("Regardless of whether hybrid groups are cognizable under

Batson, defendant did not produce 'evidence sufficient to permit

the trial judge to draw an inference that discrimination ha[d]

occurred,' and thus failed to make a prima facie showing that

the prosecutor discriminated against white women in his exercise

of peremptory challenges." (quoting Johnson, 545 U.S. at 170);

Rodriguez v. Schriver, 392 F.3d 505, 511, n.9 (2d Cir. 2004) (in

deciding a step-two Batson claim, court noted "we need not reach

47

the issue of whether or when national origin discrimination is a cognizable group for <u>Batson</u> protection.").

Accordingly, the question of a cognizable group is not at issue here.

## G) Determination Of The Mistrial Motions And Supplemental Instructions Were Appropriate

The Petitioner argues that the Trial Court erred in not granting a mistrial during the fourth and last day of deliberations, in view of the jury's multiple notes indicating deadlock, and that the court's supplemental charges, including the <u>Allen</u> charges, were coercive.  (Petition at 3, 8). Petitioner contends that the Trial Court should have granted the mistrial because it allegedly found Juror Three "grossly unqualified" and because the "three <u>Allen</u> charges coerced the sole minority juror for acquittal to abandon her conscientiously held beliefs and to vote guilty." (Pet. Memo at 36).

A trial judge may "declare a mistrial 'whenever, in their opinion, taking all the circumstances into consideration, there is a 'manifest necessity' for doing so." <u>Renico v. Lett</u>, __ U.S. __, 130 S. Ct. 1855, 1863 (2010) (quoting <u>United States</u>

48

v. Perez, 9 Wheat. 579, 580, 6 L. Ed. 165 (1824)).  The decision
whether to declare a mistrial "is reserved to the 'broad
discretion' of the trial judges, a point that has been
consistently reiterated in decisions of this Court." Renico,
130 S. Ct. at 1863 (quoting Illinois v. Somerville, 410 U.S.
458, 462, 93 S. Ct. 1066, 35 L. Ed. 2d 425 (1973)).  This broad
discretion is "'especially compelling' in cases involving a
potentially deadlocked jury," as "the trial court is in the best
position to assess all the factors which must be considered in
making a necessary discretionary determination whether the jury
will be able to reach a just verdict if it continues to
deliberate." Id. (quoting Arizona v. Washington, 434 U.S. 497,
509, 510, n. 28, 98 S. Ct. 824, 54 L. Ed. 2d 717 (1978)).

        In New York, a court may not declare a mistrial unless
(1) the jury has deliberated for an extensive period of time and
(2) the court is satisfied that the jury is unlikely to reach a
verdict within a reasonable period of time. C.P.L. §
310.60(1)(a).  Factors for the court to consider include "the
length and complexity of the trial, the length of the
deliberations, the extent and nature of the communications
between the judge and the jury, and the potential effects of
requiring further deliberation." Matter of Rivera v. Firetog,

49

11 N.Y.3d 501, 507 (2008)

Applying these principles, the Trial Court did not improvidently exercise its discretion by not granting a mistrial. First, the trial involved multiple defendants and a complex set of facts. The case took nine weeks to try, including six full weeks of evidence as well as an entire day devoted to the initial charge. (A. at 902, 913).

In addition, as the Trial Court noted, even by 11:00 a.m. on the fourth day of deliberations, the jurors had spent approximately 15 to 16 hours deliberating. (A. at 895-96, 909). The court correctly determined that, considering the time waiting for responses to the jury's notes and hearing reinstruction, neither the length of the trial nor the length of the deliberations supported the declaration of a mistrial. See Santana v. Artus, 06 Civ. 7774, 2009 WL 6382488, at *17 (S.D.N.Y. July 1, 2009) (noting that between notes, deliberation time was not extensive).

The extent and nature of the Trial Court's communications with the jury also support the court's decision to deny the mistrial motions. Although the jury sent eight

notes describing itself as deadlocked or at an impasse, these
notes arrived in groups, and at three points in the day.  Three
of those notes came within a few minutes of each other, from
10:40 and 10:55 a.m., at a point when the jury had deliberated
for only 15 hours.  (A. at 892-93).  Thus, the court reasonably
exercised its discretion by declining to abort the two-month
long trial at that point.

The jury sent four more notes a couple of hours later,
during and after lunch while the jurors were waiting for the
parties.  The first requested instructions on the crime of
bribe-receiving.  (A. at 923).  A second described the jury as
"deadlocked." (Id.).  The last two criticized Juror Three, but,
while one suggested that the jury was at an "impasse," (A. at
930) the other sought further instructions to resolve the issue.
(Id.).  Considering that some jurors thought further legal
instructions might be helpful, it was reasonable for the Trial
Court to conclude that not all jurors believed they were
deadlocked at this point, which was 20 hours into deliberations.
The court providently denied the mistrial motion and instead
delivered a full Allen charge.  (A. at 942-47).

The court also responded properly to the jury's third

51

wave of notes, sent between 4:00 and 4:30 p.m. While one note
reported that further deliberation was "pointless," (Id. at
966), the second note focused on juror three's specific issue
with the law, explaining that she was refusing to follow the
instructions because she felt "[t]hings like this should be
decided by the Legislature, not by the court." (Id. at 961).
Again, it was within the discretion for the Trial Court to
conclude that further instructions about the law might be
helpful. (Id. at 950-52, 961).

    The court praised the jury for "deliberating
diligently, with seriousness and [for a] significant and
substantial period of time" (Id. at 967), and offered them three
options: (1) it could continue that evening for a few hours over
dinner, (2) it could continue the next morning, or (3) if
neither of those seemed to be "an acceptable choice," it could
report that fact in a new note.  (Id. at 967-69).  The jury
chose to continue deliberating until 8:00 p.m., revealing that,
despite the pessimism of at least one note-writer, the jury did
not believe that there was no reasonable possibility they could
agree. (Id. at 965).

    In its final communication with the jury, the court

52

inquired whether the jury believed that a further few hours of deliberations, either that day or the next, might allow them to come to a decision.  Thus, the court exercised its discretion in refusing to grant a mistrial in answer to the jurors' final notes without finding out if the jury was actually deadlocked.

While some notes leveled accusations against Juror Three, others explained that her concern seemed to be with the concept of "law" that came from a judge, rather than from the Legislature. (Id. at 961).  That note allowed the court to clarify the fact that the laws at issue were not "judge-made," but had in fact been duly enacted by the Legislature.  Notably, from that point on, there were no more accusatory or frustrated notes, or any sign that juror three felt isolated, intimidated, or distressed.  Thus, under these circumstances, the Appellate Division and the New York Court of Appeals correctly determined that the Court properly declined to grant the mistrial motions. Guardino I, 62 A.D.3d at 546; Guardino II, 15 N.Y.3d at 665.

In addition, the Petitioner argues that the Trial Court's supplemental instructions improperly targeted the minority juror and coerced her to vote guilty.  The Appellate Division, however, found that the Trial Court had properly

53

"cautioned the jurors not to surrender their conscientiously held beliefs, and there was nothing coercive in any of [the supplemental] instructions." Guardino I, 63 A.D.3d at 546.

The propriety of a state trial court's jury instructions is ordinarily a matter of state law that does not raise a federal constitutional question. See Cupp v. Naughten, 414 U.S. 141, 146, 94 S. Ct. 396, 38 L. Ed. 2d 368 (1973); Smalls v. Batista, 6 F. Supp. 2d 211, 219 (S.D.N.Y. 1998). Even if a jury instruction is improper under state law, federal habeas corpus relief is unavailable unless the instruction also violated the petitioner's rights secured by the constitution, laws, or treaties of the United States. See Estelle v. McGuire, 502 U.S. 62, 71-72, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) (finding that a claim that jury instruction was incorrect as a matter of state law is not a basis for federal habeas relief).

Thus, federal habeas corpus relief will only be granted on the basis of a supplemental charge where it is "established not merely that the instruction is undesirable, erroneous, or even 'universally condemned' but that it violated some right that was guaranteed to him by the Fourteenth Amendment." Smalls, 6 F. Supp. 2d at 219-20 (quoting Cupp, 414

54

U.S. at 146).  In determining whether the jury instruction was so coercive as to violate the federal constitution, "the instruction must be viewed as a whole," Clark v. Irvin, 844 F. Supp. 899, 906 (N.D.N.Y. 1994), and considered "in its context and under all the circumstances." Jenkins v. United States, 380 U.S. 445, 446, 85 S. Ct. 1059, 13 L. Ed. 2d 957 (1965) (per curiam) (finding coercive a judge's direction to the jury that, "You have got to reach a decision in this case.").

Under New York law, if the court determines a need for a supplemental instruction, it should "issue an appropriate and balanced deadlock instruction that, in tenor and substance, conveyed the principles reflected in the pattern charge, supplemented by a focused response to the other issues raised in the note." People v. Aleman, 12 N.Y.3d 806, 807 (2009). Additionally, courts may issue "duty to deliberate" charges when faced with situations where a jury signals an impasse.  See e.g., People v. Couvertier, 222 A.D.2d 239, 239 (1st Dep't 1995) (responding to a jury note stating that one juror could not be impartial for personal reasons by instructing the jury of its duty to deliberate); People v. Spragion, 288 A.D.2d 498, 498 (2d Dep't 2001) (instructing jurors on their "duty to deliberate, to try to agree, but not to relinquish their honest convictions"

where juror six sent a note asking if she could vote undecided, and thereafter juror seven sent a note complaining that juror six was not cooperating in the deliberations).

Thus, a trial court, upon being informed that the jury is deadlocked, may give the jury an Allen charge urging the jury to continue its deliberations in order to arrive at a verdict. The supplemental charge to deliberating jurors may urge them to continue to discuss the evidence and to listen "to each other's arguments," but also must emphasize that "the verdict must be the verdict of each individual juror, and not the mere acquiescence in the conclusion of his fellows." Allen, 164 U.S. at 501.

Here, contrary to Petitioner's claim, the Trial Court delivered balanced and non-coercive instructions that were proper under New York law, and did not violate the Petitioner's constitutional rights. The first note regarding Juror Three read, "If we cannot deliberate with a juror or if there was any violation of any laws because 'that's the way business is done,' do we continue?" (A. at 778). The next note read, "Does Juror number three have a right to vote not guilty without being slenderized." (Id. at 839). Petitioner contends that the Trial

56

Court should have stated that "yes, jurors have a right [to] vote not guilty without being slanderized." (Pet. Memo. at 80). Petitioner also argues that the charge was flawed because the court did not specifically state that "juror number three could hold onto her 'conscientiously held beliefs' or stick to her arguments or stand up for her strong opinions but did say she should not follow what she personally thought or believed the law is or should be." Id.

In Spears v. Grenier, the Second Circuit explicitly rejected the argument that there is "a bright-line rule that a necessary component of any Allen-type charge requires the trial judge to admonish the jurors not to surrender their own conscientiously held beliefs." 459 F.3d 200, 202 (2d Cir. 2006). Thus, "there is no per se rule that a supplemental charge to a deadlocked jury without accompanying cautionary language is coercive." Rivera v. West, No. , 2011 WL 3648627, at *7 (S.D.N.Y. 2011).

Here, the Trial Court did not relate the charge to Juror Three but generally addressed the tension that was apparent in the jury room. The court's supplemental charge used even milder and more neutral language than some of the language

57

used in Spears.  Compare Spears, 459 F.3d at 202 ("I have a very strong feeling that you should be able to reach a verdict."). The charge is, at times, verbatim to the "Duty to Deliberate" charge.  See C.J.I. (NY) 42.08, Jury's Duty to Deliberate.  Nor "can it be said that [the charge] singles out the 'closed mind' juror, except the juror who is so closed minded that the juror refuses to deliberate."  Brown v. Walsh, No. 06-1130, 2009 WL 3165712, at *6 (N.D.N.Y. Sept. 28, 2009) (addressing a claim that Allen charge was directed to holdout jurors and stating that , "[f]irst, if there were no disagreement, no Allen charge would be required.  Second, a disagreement involves at least two sides.  Nothing in the Allen charge given to the jury in this case could be construed as coercing the holder of one view or the other to surrender that view.").

That language of the supplemental instruction here is mild and completely neutral as to whether the jury would reach a verdict.  The Trial Court reminded the jury that they should discuss the evidence, consult with each other, listen carefully to each other, and reason together "with a view toward reaching an agreement, if that can be done, without surrendering individual judgment." (A. at 839).  The Trial Court stated that the jury should not "deliberate with a closed mind, nor should

58

you ignore my instructions on the law which all jurors are obligated to follow." (Id.).  In this context, the Trial Court stressed, "Each of you must decide the case for yourself but only after a fair and impartial consideration of the evidence and the law with your fellow jurors. You should not surrender an honest view of the evidence." (Id.).

The Trial Court also reminded the jurors that it was not unusual for deliberations to become difficult, contentious, and intense, but warned them to avoid rudeness, harsh language, and name-calling, which was "counterproductive" and led to "people shutting down, not using common sense, logic and reason." (Id. at 840).  The Trial Court charged the jury to show respect for each other, and to remember that, while it was their function to decide the facts of the case, "you must follow the law as I instructed you on the law and not follow what you may personally think or believe the law is or should be."  (Id. at 840-41).

In contrast, courts in this district have found the supplemental instruction coercive where the charge is "replete 'with coercive and intimidating language,' commentary on the

59

evidence which was 'biased against the defense,' and 'shaming'
harangues 'harshly attacking [the jurors'] capacity to fulfill
their role as jurors." U.S. v. McDonald, 835 F. Supp. 2d 472,
482 (S.D.N.Y. 2011) (quoting Fong v. Poole, 522 F. Supp. 2d 642,
660 (S.D.N.Y. 2007)).

        The Petitioner has also argued that the court's final
Allen charge required the jury to reach a verdict. (Pet. Memo.
at 83).  The court reminded the jury that:

> Remember that each of you made a commitment when you
> became a juror in this particular case, a commitment
> that requires you to reason and deliberate together,
> to reach a fair, impartial, objective and just verdict
> based only on the evidence that came to you during the
> course of the trial and the instructions on the law
> that I gave you.

(A.  At 947).

        This passage is nearly identical to the language of
the pattern charge, which reads:

        Remember that each of you made a commitment when you
became a juror that requires you to reason and deliberate
together to reach a fair and a just verdict based only on the
evidence.  C.J.I. (NY), Jury's Duty to Deliberate.

At the same time, the court also balanced these
instructions with admonitions that no juror should "violate his
or her conscience" or "abandon his or her best judgment." (A. at
945). The court reminded the jury that any verdict they reached
"must be the verdict of each juror and not mere acquiescence in
the conclusion of others." Id. Unlike in Fong, on which
Petitioner relies, the trial judge here did not (1) tell the
jurors that the "point of this process is to reach a verdict,"
(2) and that they should not have allowed themselves to be sworn
as jurors if they thought "this is a decision beyond your
capacity to reach," nor (3) failed to remind them that no one
should surrender his or her conscientiously held beliefs. 522
F. Supp. 2d 642, 646, 659 (S.D.N.Y. 2007). Finally, the court
did not fail to tell the jury "that [it] had an option of
stating that they were hung." (Pet. Memo. at 84). The Trial
Court stated:

> What I'm going to ask you to do, so I know your
> thinking on this subject, is this. I'm going to return
> you to the jury room for the purpose of notifying me
> of what you feel will be productive, if at all, in
> this matter with regard to an unanimous verdict. I'm
> prepared to do the following, or choices on the
> following matters, on what you tell me. If you feel
> that instead of continuing on today, that breaking for
> the day and taking the rest of the evening off as
> opposed to ordering dinners in and continuing and
> coming back tomorrow to continue, in other words,
> breaking now, 5 to 5, going home, refreshing

yourselves, returning tomorrow to continue, if that
would be helpful, then I'd want you to tell me that.
If staying here, ordering in, having dinners brought
in an hour, and continuing on would be helpful or
productive, I'd want you to tell me that.  But if you
feel that neither of those choices would be helpful or
might result in an unanimous verdict, if you feel as a
jury that neither choice is an acceptable choice, then
send me a note, and tell me your situation as a
deliberating jury.  That's what I'm going to ask you
to do.  And I will just wait for you to send me a
response.  Okay.  You can go home -- review them
quickly.  You can go home now, give you brief
separation instructions, stop deliberating, come back
tomorrow, and simply continue.  You can continue to
deliberate this evening, and the dinner orders will be
taken and the food will be delivered.  And you have
dinner in. And as I said, I won't keep you beyond the
hour that I mentioned.  Or you can tell me that you
feel that neither of these options is -- will in any
way make your situation one that will possibly lead to
a unanimous verdict.

(A.  At 967-69).

The court's last option permitted the jury to return to
court to say that neither of the preceding options would result in a
unanimous verdict and was therefore well aware that it could render
no unanimous verdict.

The Petitioner also has argued that in response to
various notes announcing a jury impasse, the Trial Court
"repeatedly stated that the jury's verdict must be 'based on the
evidence in the record' and 'nothing outside of that,'" and that
it told "juror number three not to surrender her individual

judgment only if her judgment was based on record evidence."
(Pet. Memo. at 81).  However, the pattern jury charge includes
the instruction that the jury makes "certain that the decision
you reach is based solely on the evidence and the law."  C.J.I.
(NY) 42.08, Jury's Duty to Deliberate ("Make certain that the
decision you reach is based solely on the evidence and the law,
and is not influenced . . . by sympathy . . . baseless
speculation . . . bias or prejudice"); see also Robinson v.
LaClair, 09-3501, 2011 WL 115490, at *10 (E.D.N.Y. Jan. 13,
2011) finding Allen charge proper; charge included "based solely
on the evidence and the law" language).

        Moreover, this charge was delivered in response to one
of the deadlock notes, which stated that "We have one juror who
will not discuss the evidence and is basing conclusions on
emotional concerns such as union involvement in cleaning up
9/11." (A. at 892-93).  Thus, in response, the court did not
direct the jury to ignore any lack of evidence but rather
reminded the jury that it had a duty to base any verdict it
reached only on the evidence and the law, an instruction that is
drawn straight from the pattern charge.  Nor did the charge
instruct Juror Three "not to surrender her individual judgment
only if her judgment was based on record evidence."  (Pet. Memo

63

at 81).  The court stated:

> Now, keeping that in mind, I remind you that under
> your oath as jurors, in this case, it is the duty of
> each of you to consult with one another and to
> deliberate with one another, which as I said the other
> day, doesn't just mean thinking about something.  It
> means discussing the case with one another, with a
> view to reaching an agreement, with a view to reaching
> an agreement on a verdict, if you can do so without
> violence to individual judgment or without
> surrendering your individual judgment as long as your
> judgment is based on the evidence and the law as has
> been stated to you previously.  That's what the
> judgment of a juror is all about under the law -- the
> evidence in the case, nothing outside that, and the
> law as I've explained it to you.

(A. at 915-16).

Here, the court's reference to "evidence and the law"
was entirely standard, and the court here also did not use the
term "record evidence."

The Petitioner argued in his state appeals, invoking
People v. Buford, 69 N.Y.2d 290 (1987), and C.P.L. § 270.35(1),
that Juror Three was "grossly unqualified" and thus the court
should have conducted the type of "probing and tactful inquiry"
described by Buford, and then discharged that juror.

In general, "[j]uror discharge and voir dire

64

proceedings are governed by state law." <u>McCrary v. Artuz</u>, No. 95-622, 1995 WL 728423, at *3 (E.D.N.Y. Nov. 28, 1995).  The "text of the federal habeas statute makes clear that habeas corpus relief is not available for state law errors that do not rise to the level of federal constitutional violations.  28 § U.S.C. 2254(a); <u>see also</u> <u>Estelle v. McGuire</u>, 502 U.S. 62, 67-68, 112 S. Ct. 475, 116 L. Ed. 2d 385 (1991) ("[I]t is not the province of a federal habeas court to reexamine state-court determinations on state-law questions.  In conducting habeas review, a federal court is limited to deciding whether a conviction violated the Constitution, laws, or treaties of the United States."  The Petitioner's state statutory claim here does not implicate the "Constitution, laws or treaties of the United States," <u>Id.</u> and "federal habeas corpus relief does not lie for errors of state law." <u>Smith v. Phillips</u>, 455 U.S. 209, 211, 102 S. Ct. 940, 71 L. Ed. 2d 78 (1982); <u>see also</u> <u>Washington v. Zon</u>, No. 04-6351, 2009 WL 2982977, at *5 (W.D.N.Y. Sept. 14, 2009) (claim of violation of C.P.L. § 270.35 is not cognizable on habeas review unless the violation implicates federal constitutional concerns).  Thus, Petitioner's arguments, which are based solely on state law, are not cognizable on habeas review.

In addition, the appellate courts correctly rejected this claim.  Under New York law, "[a] sworn juror must be discharged when facts come to light . . . indicating that the juror is 'grossly unqualified to serve.'"  People v. Harris, 99 N.Y.2d 202, 212 (2002); C.P.L. § 270.35(1).  However, while a court should lean toward disqualifying jurors of "dubious impartiality" during jury selection, the standard for discharging a sworn juror is far more stringent.  Buford, 69 N.Y.2d at 298.  Indeed, the Court has cautioned that a decision to discharge a sworn juror must not be based on speculation or on "equivocal responses."  Id. at 299.

The Appellate Division rejected Petitioner's claim, holding that "[e]ven though, according to the jury's notes, one juror was unwilling to apply the law to the facts, there was no basis for finding the juror grossly unqualified (see C.P.L. § 270.35(1)), simply on the basis of the notes, without making an inquiry.  However, the Petitioner never requested an inquiry, but merely reiterated his request for a mistrial.  In any event, the apparent problem was resolved after further instructions concerning the law were given to the jury.  Guardino I, 62 A.D.3d at 546.

66

While in rare cases a court may be required to halt deliberations to make an inquiry, the defense, as the Appellate Division noted, never asked for an inquiry - either of this juror or of the others.  Even in cases of supposed physical intimidation, carefully tailored instructions to the jury as a whole, like those the judge used here, may be the best approach. For example, in People v. Gathers, 10 A.D.3d 537 (1st Dep't 2004), the judge received one note from a lone dissenting juror complaining of belligerent conduct by other jurors, and a collective note from the other jurors that disputed the lone juror's claims.

Under those circumstances, as in this case, the court "properly determined that supplemental instructions would be sufficient and that further inquiry was unnecessary."  See also People v. Scott, 213 A.D.2d 501, 501-02 (2nd Dep't 1995) (after receiving a note complaining of yelling stating that "it seemed like they want to beat me;" the court responded with instruction about "the need for all jurors to accord each other mutual respect" and cautioning against a climate in which a juror might feel threatened or intimidated); see also People v. Cochran, 302 A.D.2d 276, 276-77 (1st Dep't 2003) (after shouting was heard, a juror sent note expressing concern for another juror, who

"allegedly was upset by a third juror's temper;" the court responded with a charge that deliberations should be conducted "politely, rationally and free from any fear," and should be respectful, "no further inquiry was needed").

Similarly, the Trial Court correctly handled the jury notes about Juror Three through a series of detailed and careful instructions and was not required to conduct an unrequested inquiry into the course of deliberations or to discharge the juror summarily. Accordingly, the retention of Juror Three was appropriate.

In sum, the Appellate Division's determination that Petitioner's counsel failed to establish a prima facie case of discrimination is not contrary to, or based on an unreasonable application of, Supreme Court law. Consequently, Petitioner is not entitled to habeas relief.

### III. Conclusion

For the foregoing reasons, the petition for a writ of habeas corpus is denied.

68

As Petitioner has not made a substantial showing of the denial of a constitutional right, a certificate of appealability will not issue. 28 U.S.C. § 2253; see also United States v. Perez, 129 F.3d 255 (2d Cir. 1997); Lozada v. United States, 107 F.3d 1011 (2d Cir. 1997). Pursuant to 28 U.S.C. § 1915(a)(3), it is hereby certified that any appeal from this order would not be taken in good faith. Coppedge v. United States, 369 U.S. 438, 444-45, 82 S. Ct. 917, 8 L. Ed. 2d 21 (1962).

It is so ordered.

New York, NY
November 30, 2012

_____
ROBERT W. SWEET
U.S.D.J.

69